Jimmy ATTEBERRY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0808–CR–705.

Court of Appeals of Indiana.

July 7, 2009.

Michael R. Fisher, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Jimmy Atteberry ("Atteberry") was convicted in Marion Superior Court of murder and Class A felony rape. Atteberry appeals and presents three issues, which we reorder and restate as follows:

I. Whether the trial court erred in admitting Atteberry's statement to the police into evidence;

II. Whether the trial court erred in admitting testimony that Atteberry's DNA was included in a national DNA database; and

III. Whether the evidence is sufficient to support his conviction for rape.

Concluding that no evidentiary error occurred, but that the State did not present sufficient evidence to prove the charged crime of rape, we affirm in part, reverse in part, and remand with instructions to vacate Atteberry's rape conviction.

### Facts and Procedural History

In 1985, nineteen-year-old L.L. lived with her boyfriend in an apartment on Prospect Street in Indianapolis. At approximately 10:30 p.m. on Saturday, September 21, 1985, L.L. told her boyfriend that she was going to a nearby store to get some snacks. L.L.'s boyfriend gave her some money and the keys to their car. L.L. left, and her boyfriend went to bed. When he awoke Sunday morning, he noticed that L.L. had not returned home.

L.L.'s boyfriend then telephoned L.L.'s friends and family to see if they knew where she was, but no one had seen her. L.L.'s father telephoned the police and reported that his daughter was missing.

Later that day, a boy found L.L.'s bank book near railroad tracks and took the book to the police. The police told L.L.'s family about the book, and L.L.'s family and her boyfriend began to look for her near the railroad tracks where the bank book was found. They found L.L.'s personal papers, including old paystubs, and other items with L.L.'s name strewn along the railroad embankment for almost a quarter of a mile. L.L.'s brother eventually spotted the car L.L. had been driving. The car was parked in an alley next to a building near the tracks. When he went to investigate, he saw his sister's body lying near the car. Without disturbing the scene, he returned to tell his parents not to go near the car and then telephoned the police.

The police arrived at the scene and confirmed that L.L. was indeed dead. Further investigation revealed that L.L. had been stabbed twice in the chest, once on each breast, which caused her to bleed into her lungs. L.L. had also been strangled with such force that her larynx had been crushed and the muscles behind her esophagus had been crushed against her spine. L.L.'s fingernails were torn in an apparent attempt to stop her attacker. L.L.'s fatal injury was the result of repeated blows to her head from a concrete block which the police found broken into pieces in the alley. The blows from the block crushed L.L.'s skull and eye socket. Blood and hair found in L.L.'s fingers indicated that she had put her hands over her head in an attempt to defend herself. But the blows from the block were so forceful that a ring on her finger was flattened.

L.L.'s body was fully clothed, but further examination revealed that she had been sexually assaulted. Specifically, L.L.'s anus had been injured, and semen stains were found in her underwear. However, her vagina did not show any signs of injury. Semen was not found in L.L.'s anus or vagina.

After L.L.'s body was discovered, Indianapolis Police Department detectives Louis Christ ("Detective Christ") and Tom Minor ("Detective Minor") went to the apartment building where L.L. had lived to interview tenants. They eventually spoke with Michael Bender ("Bender"), who worked for the Salvation Army. Bender told the detectives that a man named Jerry Darnell ("Darnell") had lived in his apartment for the past few months. Darnell also worked for the Salvation Army and had been living at the Salvation Army mission until he moved in with Bender. After L.L.'s body had been found, Darnell had taken his belongings and moved out of Bender's apartment without notice.

Because of this coincidence, Detective Christ was interested in speaking with Darnell, but was unable to locate him. When Detective Christ changed positions at the police department, the case lay dormant without further leads. As the years passed, technology advanced, and DNA identification became possible. In October 2006, the police collected DNA from the semen stains found in L.L.'s underwear. This DNA was then placed into CODIS, a national computer database that compares DNA samples taken from crime scenes with DNA samples taken from convicted felons.[1] The CODIS comparison indicated that the DNA taken from the stains in

---

1. CODIS stands for the Combined DNA Index System, http://www.fbi.gov/hq/lab/html/codisl. htm. *See also* "What is CODIS?" http://www. dna.gov/ solving-crimes/cold-cases/howdata-basesaid/codis.

L.L.'s underwear likely matched that of defendant Atteberry, who lived in St. Louis, Missouri. Sergeant Mark Albert ("Sergeant Albert"), who worked for the Indianapolis Police Department's "cold case" unit, was assigned to investigate the case.

Sergeant Albert went to St. Louis and obtained a warrant from a local judge authorizing him to take a DNA sample from Atteberry. Sergeant Albert, accompanied by Detective Tom Carroll of the St. Louis Metropolitan Police Department, went to a welding shop in St. Louis where Atteberry worked. When they met Atteberry, Sergeant Albert stated, "This is Detective Tom Carroll of the St. Louis Metropolitan Police[,] and I am Sergeant Albert." Tr. p. 683. Atteberry agreed to leave the "loud, very dark, and very hot" welding shop and go to a police station to speak with the detectives. Tr. p. 684. At the station, Atteberry was taken to a room, and the police explained his Miranda rights to him, both verbally and in writing. Sergeant Albert read part of the Miranda waiver form to Atteberry as follows: "I've been informed by Sergeant Mark Albert, that's me, of the Metro Police Department that ... wants to question me about ... background information okay." Ex. Vol. III, State's Ex. 2A, p. 254. The waiver form was produced by the St. Louis Metropolitan Police Department, and contained the heading "Metropolitan Police Department—City of St. Louis." Ex. Vol. III, State's Ex. 1. The form had a blank line for the officer's name, followed by "of the St. Louis Metropolitan Police Department." *Id.* Sergeant Albert testified that he drew a line through the words "St. Louis."

After his Miranda rights were explained to him, Atteberry agreed to speak with the police. The police asked Atteberry about the prior rape and sex crime convictions which he had committed in Arkansas, Illinois, and Missouri. They also talked about Atteberry's use of aliases. When asked about Indiana, Atteberry admitted that he had worked at the Salvation Army in Indianapolis during the warm weather months of 1985. Atteberry also admitted that he had lived in Indianapolis with a man named "Mike" and used the alias "Jerry Darnell." Ex. Vol. III, State's Ex. 2A, pp. 276, 278. Toward the end of the interrogation, Sergeant Albert told Atteberry that he was investigating L.L.'s murder and that he had a warrant to obtain a DNA sample from Atteberry. Shortly thereafter, Atteberry requested an attorney and stopped answering questions. Subsequent DNA testing confirmed by an overwhelming probability that the DNA collected from the semen stains in L.L.'s underwear belonged to Atteberry.

On August 3, 2007, the State charged Atteberry with murder and Class A felony rape. Prior to trial, Atteberry filed a motion to suppress his statement to the police, claiming that police deception rendered the waiver of his Miranda rights involuntary. This motion was denied. A jury trial was held on June 16, 17, and 18, 2008. Immediately before the trial began, the State moved to amend the charging information to allege that Atteberry had committed criminal deviate conduct instead of rape. Atteberry objected, and the State withdrew its motion when the trial court indicated that it was not inclined to grant the State's request. At trial, Atteberry again objected to the admission of his statement to the police, but his objection was overruled. At trial, Atteberry also argued that any testimony indicating that his DNA was contained in the CODIS database was inadmissible evidence of prior misconduct. The trial court ultimately permitted the State's DNA witness to testify that Atteberry's DNA was profile was

in a DNA database at the "national level." Tr. pp. 459–60, 466.

The jury found Atteberry guilty as charged, and at a sentencing hearing held on July 9, 2008, the trial court sentenced Atteberry to sixty years for his conviction for murder and to fifty years for his conviction for rape. The court ordered the sentences to be served consecutively. Atteberry now appeals.

## I. Statement to Police

■■■ Atteberry claims that police deception rendered the waiver of his Miranda rights involuntary and that the trial court therefore erred in admitting his statement into evidence. When a defendant challenges the admissibility of his confession, the State must prove that the defendant's statement was voluntary. *Pruitt v. State,* 834 N.E.2d 90, 114 (Ind. 2005).[2] In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including the crucial element of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health. *Id.* at 115. On appeal, we look to the totality of the circumstances surrounding the waiver or confession, and our focus is whether the waiver or confession was free and voluntary and not induced by any violence, threats, promises, or other improper influences. *Jackson v. State,* 735 N.E.2d 1146, 1153 (Ind.2000).

■■ We do not reweigh the evidence but instead view the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom, in order to determine if there is substantial, probative evidence of voluntariness. *Pruitt,* 834 N.E.2d at 114. We will uphold the trial court's finding if there is substantial evidence of probative value to support it. *Id.; Jackson,* 735 N.E.2d at 1153–54. Although police deception is a factor that weighs against the voluntariness of a confession, *Luckhart v. State,* 736 N.E.2d 227, 229 (Ind.2000), "police deception does not automatically render a confession inadmissible." *Miller v. State,* 770 N.E.2d 763, 767 n. 5 (Ind.2002). Instead, our supreme court has repeatedly held that police deception during an interview is but one factor to consider in the totality of the circumstances. *Id.*

■■ On appeal, Atteberry claims that Sergeant Albert deceived him when he introduced himself by saying, "This is Tom Carroll of the St. Louis Metropolitan Police and I am Sergeant Albert." Tr. p. 683. We are not convinced. Detective Carroll did work for the St. Louis police, and Sergeant Albert never specifically claimed to be a member of the St. Louis police force. Thus, Sergeant Albert's statement was not false.

Atteberry also claims that he was deceived by the waiver of rights form, which he claims identified Sergeant Albert as being a St. Louis police detective. As noted, the waiver form contained the heading "Metropolitan Police Department— City of St. Louis," and had a blank line on which had been written "Sgt. Mark Albert," followed by the words "of the St.

---

2. Under the United States Constitution, the State is required to prove by a preponderance of the evidence that the defendant's statement was voluntary. *Id.* Our courts have interpreted the Indiana Constitution to require the State to prove beyond a reasonable doubt that the defendant voluntarily waived his rights and that his confession was voluntarily given.

*Id.* at 114–15. Atteberry does not develop a separate argument based on the Indiana Constitution, and we therefore address his argument under the federal standard. Moreover, even if we considered Atteberry's claim under the Indiana Constitution, we would conclude that the State met this more stringent standard.

Louis Metropolitan Police Department." Sergeant Albert testified that he drew a line through the words "St. Louis." Atteberry contends that the words "St. Louis" are not stricken out but are instead underlined. Our review of this exhibit reveals that the line through the words "St. Louis" was drawn through the bottom portion of that word and could be mistaken for an underline. Still, the line was not actually drawn underneath the words "St. Louis." On appeal, we consider only the evidence favorable to the trial court's decision. We therefore cannot say that Sergeant Albert lied about striking out these words.

Atteberry also claims that he was deceived when Sergeant Albert told him that the police wanted to talk to him about "background information," when they actually planned to question him about L.L.'s murder. It is apparent that Sergeant Albert did not want to tell Atteberry that he was from Indianapolis and that he wanted to question Atteberry regarding L.L.'s murder in 1985. Indeed, Sergeant Albert admitted that he did not intend to tell Atteberry that he was from Indianapolis until after he had questioned him.

However, Atteberry does not explain how the fact that he did not know where Sergeant Albert worked vitiates the voluntariness of Atteberry's statement, especially considering that at all relevant times, Atteberry knew that his questioners were police officers and that prior to questioning, the officers explained to Atteberry, both orally and in writing, his right to remain silent and to have counsel present during questioning. There is also no claim or indication that the police interrogated Atteberry for an inordinately long time, and there is no claim or indication of coercion.

■ Atteberry's claims regarding police deception can be distilled to the argument that had he known that Sergeant Albert was from Indianapolis and wished to talk to him about the events surrounding L.L.'s murder in 1985, then he would have decided not to speak with the police. However, it has long been held that "awareness of all the possible subjects of questioning in advance of interrogation 'is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege [against self-incrimination].'" *Bivins v. State*, 642 N.E.2d 928, 937 (Ind.1994) (quoting *Colorado v. Spring*, 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). The failure of the law enforcement officials to inform a suspect of the subject matter of the interrogation does not affect the suspect's decision to waive his Fifth Amendment privilege in a constitutionally significant manner. *Spring*, 479 U.S. at 577, 107 S.Ct. 851.

■ Further, a defendant's waiver of his Fifth–Amendment rights is not specific to any particular offense. *See id.* at 577, 107 S.Ct. 851 (holding that defendant's waiver of his Miranda rights after being arrested for illegal firearms transactions also covered police questioning regarding shooting death in which defendant was a suspect); *Bivins*, 642 N.E.2d at 937 (holding that defendant's waiver of Miranda rights after being arrested for forgery was valid with regard to police questions about unrelated robberies and murder in which he was a suspect); *see also Arizona v. Roberson*, 486 U.S. 675, 683–85, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (holding that a defendant who invokes the right to counsel for interrogation on one offense may not be re-approached regarding a separate offense unless counsel is present).

■ Therefore, absent evidence of coercion, the fact that Sergeant Albert did not tell Atteberry that he was from Indianapolis and planned to question Atteberry re-

garding L.L.'s murder and rape does not render Atteberry's decision to waive his Miranda rights involuntary. *See Kahlenbeck v. State*, 719 N.E.2d 1213, 1218–19 (Ind.1999) (holding that police deception of falsely claiming to possess certain evidence during the interrogation did not render the defendant's statement involuntary where defendant had been read his rights, indicated that he understood them, was a mature individual of normal intelligence and had not been interrogated for an inordinate amount of time); *Carter v. State*, 490 N.E.2d 288, 290–91 (Ind.1986) (holding that defendant's statement to the police was voluntary despite fact that police falsely claimed that the victim was still alive because defendant had been informed of his rights, indicated that he understood them, was a mature individual of normal intelligence, and was not interrogated for an inordinate amount of time). The fact that Sergeant Albert worked for the Indianapolis Police Department is, constitutionally speaking, immaterial to the voluntariness of Atteberry's waiver and statement.[3] The trial court did not abuse its discretion in admitting into evidence Atteberry's statement to the police.

## II. DNA Database Evidence

■ Atteberry also claims that the trial court erred when it permitted the State's witness to testify that Atteberry's DNA was found in a national DNA database. Prior to the testimony of one of the State's witnesses, Atteberry's counsel notified the

trial court that he was concerned that the witness would testify that Atteberry's DNA had been in the CODIS database. Atteberry argued that because the DNA of convicted felons was in CODIS, any reference thereto would therefore place before the jury evidence of Atteberry's prior criminal acts in contravention of Evidence Rule 404(b). The trial court ultimately allowed the witness to testify only that Atteberry's DNA was located in a "national database," but prohibited any mention of how Atteberry's DNA was put into the database. The witness who mentioned the database testified only briefly and did not mention Atteberry's prior convictions.

■ In addressing this argument, we first note that the admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind.Ct. App.2008), *trans. denied.* Indiana Evidence Rule 404(b) provides generally that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evidence Rule 404(b) was designed to assure that the State, relying upon evidence of uncharged misconduct, does not punish a person for his character. *Rogers*, 897 N.E.2d at 960. The effect of Rule 404(b) is that evidence is excluded only when it is introduced to prove the "forbidden inference" of demon-

---

**3.** Even if we were to agree with Atteberry that his statement should have been suppressed, we would conclude that any error was harmless. In his statement, Atteberry admitted that he lived in Indianapolis in 1985 with a man named "Mike," worked at the Salvation Army, and went by the name of Jerry Darnell. While this evidence did connect Atteberry with the crime, it pales in comparison to the DNA evidence from CODIS which already indicated that Atteberry murdered and sexual-

ly assaulted L.L. This DNA evidence was verified by the DNA sample taken from Atteberry, pursuant to a valid warrant, in St. Louis. Even Atteberry admits that this DNA evidence "demonstrated an overwhelming probability" that the DNA found in L.L.'s underwear matched his DNA. Appellant's Br. p. 4. In light of this evidence, any error in the admission of Atteberry's statement would be harmless.

strating the defendant's propensity to commit the charged crime. *Id.*

The trial court in the present case specifically prohibited any direct mention of CODIS or its background and permitted the State's witness to testify only that Atteberry's DNA was in a national database. This evidence was relevant to show why Atteberry, living in St. Louis, was a suspect in an Indianapolis murder. There was no evidence which informed the jury that only convicted felons have their DNA profiles put into this national database.

 Atteberry argues, however, the jury could have inferred that, because Atteberry's DNA profile was in the database, he had been convicted in the past. This is nothing more than speculation. Moreover, evidence which creates a mere inference of prior bad conduct does not fall within the purview of Evidence Rule 404(b). *Rogers,* 897 N.E.2d at 960 n. 3 (citing *Dixson v. State,* 865 N.E.2d 704, 712 (Ind.Ct.App. 2007), *trans. denied* ). We therefore cannot agree with Atteberry that the admission of evidence that his DNA profile was found in a national database constituted inadmissible evidence of his prior felony convictions.[4]

### III. Sufficiency of Rape Evidence

Finally, Atteberry argues that the State presented insufficient evidence to prove that he raped L.L. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *Klaff v. State,* 884 N.E.2d 272, 274 (Ind.Ct.App.2008). Instead, we consider only the evidence which supports the conviction, along with the reasonable inferences to be drawn therefrom. *Id.* We will affirm the conviction if there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.*

 The State alleged in its charging information that Atteberry "did, while armed with a deadly weapon, that is: a knife, knowingly have sexual intercourse with [L.L.], a member of the opposite sex, when [L.L.] was compelled by force or imminent threat of force." Appellant's App. p. 30. This substantially tracks the language of the statute defining the crime of rape as a Class A felony at the time that Atteberry committed the offense. *See* Ind.Code § 35–42–4–1(a) (Burns.1985). "Sexual intercourse" is defined by statute as "an act that includes any penetration of the female sex organ by the male sex organ." Ind.Code § 35–41–1–26 (Burns. 1985). This statute does not require that the vagina be penetrated; instead evidence of the slightest degree of penetration by the male sex organ of the female sex organ, including the external genitalia, is sufficient. *Thompson v. State,* 674 N.E.2d 1307, 1311 (Ind.1996); *Pasco v. State,* 563 N.E.2d 587, 590 (Ind.1990). Penetration may be inferred from circumstantial evidence such as the physical condition of the victim soon after the incident. *Pasco,* 563 N.E.2d at 590.

Here, Atteberry draws our attention to the fact that while there was evidence of trauma to L.L.'s anus, there was no sign of trauma to her vagina. He further emphasizes that there was no semen found in either L.L.'s anus or vagina. Instead, semen stains were found on the front, left portion of L.L.'s underwear. This, Atteberry argues, is insufficient to establish that he penetrated L.L.'s sexual organ

---

4. Again, even if we were to conclude otherwise, any error would be harmless given the overwhelming DNA evidence.

with his penis as required by the statute. The State responds that the circumstantial evidence is sufficient to support the rape conviction, noting that its expert witness testified that the lack of trauma to L.L.'s vagina did not rule out the possibility of rape, especially where the victim was sexually active, as was L.L.

■■■ Although the lack of damage to the victim's vagina may not rule out the possibility that penetration of the female sex organ occurred, it is also not proof that such penetration did occur. The only evidence that could inferentially indicate penetration of L.L.'s sex organ is that L.L. had been anally assaulted and that semen stains were found on the front part of L.L.'s underwear. As noted above, the State argues that this inference is enough. If we were writing on a clean slate, we might be more inclined to agree with the State's position. But we are not.

In *Goolsby v. State*, 517 N.E.2d 54 (Ind. 1987), the victim had been knocked unconscious during an attack. When she regained consciousness, she complained of tenderness in her vaginal area and informed hospital personnel that she may have been raped. The examining physician testified that the victim's vagina appeared normal and that there were no signs of trauma that would indicate forced penetration. The physician also testified that his testing revealed a small amount of non-motile sperm in the victim's vagina, but he further explained that sperm from the "vast majority" of males is motile for one to two days. *Id.* at 58. Thus, the presence of non-motile sperm meant either that the victim's attacker had abnormal sperm or that the victim had been sexually active two to three days previously. The victim had engaged in consensual sexual activity approximately forty-eight hours before she was examined. Faced with this evidence on appeal, our supreme court

wrote, "Consequently, the only evidence of penetration was [the victim]'s statement of tenderness in the vaginal area. *This is not enough to support a rape conviction.* We therefore reverse the judgment of the trial court on this issue." *Id.* (emphasis added).

The State cites no case in which the only evidence of penetration of the female sex organ was the presence of semen stains in the victim's underwear. Our research has also revealed no such case. Instead, we have found numerous cases in which the evidence of penetration came from the victim's testimony, which is impossible in this case, the defendant's testimony, or the physical condition of the victim's genitalia soon after the rape. *See, e.g., Thompson*, 674 N.E.2d at 1311 (sufficient evidence of penetration to support rape conviction where victim testified that defendant had "that much of his penis in me."); *Davidson v. State*, 580 N.E.2d 238, 242–43 (Ind.1991) (sufficient evidence of penetration to support rape conviction where pathologist testified that he discovered petechial hemorrhages around opening of victim's vagina and defendant claimed to have had consensual sexual intercourse with victim); *Evans v. State*, 563 N.E.2d 1251, 1261 (Ind. 1990) (sufficient evidence of penetration to support rape conviction where State submitted no evidence indicating penetration to support rape conviction other than that victim's body was found nude except for a shirt pulled up around her shoulders, but defendant testified to rape in detail at trial); *Pasco*, 563 N.E.2d at 590 (sufficient evidence of penetration to support rape conviction where victim's body was discovered nude and with legs spread apart, defendant's palm print was found on victim's thigh, and expert medical testimony revealed presence of sperm in victim's vagina).

■ If the evidence in *Goolsby* was insufficient to prove penetration, then likewise, we are constrained to conclude here that evidence of trauma to L.L.'s anus, plus the presence of semen stains in her underwear, are insufficient to prove that Atteberry penetrated L.L.'s sex organ with his sex organ. We must therefore conclude that the evidence is insufficient to support Atteberry's conviction for rape.

The evidence at trial and on review clearly demonstrates that Atteberry sexually assaulted L.L. anally. But the crime of rape in Indiana does not include such conduct, which is instead defined by statute as criminal deviate conduct,[5] a crime for which Atteberry was not charged. The State apparently realized that it had charged the wrong crime when it untimely and unsuccessfully attempted to amend the charging information on the day trial was to begin to allege that Atteberry committed criminal deviate conduct.

■ The State's failure to properly charge Atteberry is no mere technicality that we may overlook. Fundamental due process and common sense both require that the State must prove the elements of the crime it charged, not the elements of some other crime the defendant may have committed. *See Lechner v. State*, 439 N.E.2d 1203, 1205 (Ind.Ct.App.1982) ("Conviction upon a charge not made or for an offense that is not a lesser included offense of the charged crime constitutes a denial of due process[.]"); *Nelson v. State*, 479 N.E.2d 48, 51 (Ind.1985) (reversing voluntary manslaughter conviction because

defendant was charged with felony murder and voluntary manslaughter is not an lesser included offense of felony murder). Because the State charged Atteberry with rape, but failed to present evidence sufficient to prove the essential element of penetration of the victim's sex organ by Atteberry's sex organ, we must and do reverse that portion of the judgment pertaining to Atteberry's Class A felony rape conviction and remand with instructions that the trial court vacate that conviction and the sentence imposed thereon.

### Conclusion

The trial court neither erred in admitting Atteberry's statement to the police into evidence, nor in permitting the State's witness to testify that Atteberry's DNA profile was found in a national database. However, the State failed to present sufficient evidence to establish beyond a reasonable doubt that Atteberry raped L.L.

Affirmed in part, reversed in part, and remanded for vacation of Atteberry's rape conviction.

RILEY, J., and KIRSCH, J., concur.

5. *See* Ind.Code § 35–41–1–9 (defining "deviate sexual conduct" as "an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object."); Ind.Code § 35–42–4–2 ("A person who knowingly or intentionally causes another person to perform or submit to sexual deviate conduct when … the other person is

compelled by force or the imminent threat of force … commits criminal deviate conduct … [which] is a Class A felony if: (1) it is committed by using or threatening the use of a deadly force; (2) it is committed while armed with a deadly weapon; or (3) it results in serious bodily injury to any person other than a defendant[.]").