**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 22 2014, 10:41 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STANLEY L. CAMPBELL**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DARREN L. SIVLEY,                      )
                                       )
    Appellant-Defendant,           )
                                       )
        vs.                    )     No. 02A03-1310-CR-399
                                       )
STATE OF INDIANA,                      )
                                       )
    Appellee-Plaintiff.            )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D06-1305-FD-555

**May 22, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Darren L. Sivley (Sivley), appeals his conviction for residential entry, a Class D felony, Ind. Code § 35-43-2-1.5.

We affirm.

## ISSUE

Sivley raises one issue on appeal which we restate as follows: Whether the State presented sufficient evidence beyond a reasonable doubt to sustain Sivley's conviction for residential entry.

## FACTS AND PROCEDURAL HISTORY

Savana Serban (Serban) and Sivley met in the summer of 2012 while working at the Fresh Market in Fort Wayne. The pair began dating at the end of the summer, and continued their relationship when Serban enrolled at Indiana University in Bloomington, Indiana in the fall of 2012. In February 2013, Serban ended her relationship with Sivley. Even after their break up, Sivley continued to spend a considerable amount of time at Serban's residence. In May 2013, Serban returned home for the summer and lived with Wendy Serban (Mother) and her twin sisters (the Twins).

On May 11, 2013, Serban was to pick up the Twins from a ballet class and drop them off home around 11.00 a.m. before going to work at the Fresh Market. In the same timeframe, Sivley was also supposed to be at Serban's residence to help Mother move a table that she had sold on Craig's List. Also, on that day, Mother and the Twins were leaving for Indianapolis at around 4:00 p.m. and were to spend the night there, because the Twins had to be at the dancing competition at 7:00 a.m. the next day. Mother told Sivley

2

that a Comcast technician would be coming over on May 12, 2013 to fix their cable. Since Mother knew Serban would be working at the Fresh Market and would not be available, she asked Sivley if he would be available the next day, "between 12:[00 p.m.] and 3:[00] p.m." or between "11:[00 a.m.] and 2:[00 p.m.]" to let the Comcast technician into the residence. (Transcript p. 189). Sivley agreed to be at the house around that time. Mother told Sivley that she would leave the garage door unlocked, and she would also tell Serban to leave the alarm turned off when she went to work the next morning. Thereafter, Sivley left the residence.

On the evening of May 11, 2013, Serban left work at around 7:00 p.m. She had plans to watch a movie with a friend, and later on, she was going to spend time with two of her friends. When she exited the Fresh Market, she found Sivley waiting in the parking lot next to her car. Sivley was angry; he started yelling at Serban, calling her a "lying slut" and accusing her of cheating on him. (Tr. p. 105). Sivley then threw a tube of toothpaste tube at Serban. Serban asked him why he had toothpaste, and Sivley responded that he had noticed that she had run out of toothpaste when he was at her house earlier. Serban did not want Sivley to ruin her night, and since she was in hurry to get to the movie, she promised Sivley they would talk about their issues later. Initially, Sivley blocked her way, but Serban eventually got into her car and drove off. Sivley then followed her closely, driving aggressively as if he was going to ram into her, and then slamming on his brakes. This made Serban very nervous. At the same time, Sivley was trying to call her on her cellphone. Sivley followed her onto the freeway and stayed behind her for a while before exiting.

3

Serban returned home shortly before midnight. There were no cars in the driveway, and she did not expect anyone to be there because Mother and the Twins were in Indianapolis. Serban entered through the garage door and used the side door to get inside the house. The side door was always unlocked unless the family was in for the night. Also, Serban did not turn the alarm on because she had to let the dog out. Serban looked for the dog, but it could not be found. Unable to locate the dog, Serban decided to go to her bedroom located in the basement, and change into her pajamas. She then went upstairs to the kitchen to find something to eat. While there, she heard the dog upstairs and went up to get it. As she was there talking to the dog, Serban heard her bedroom door open and shut. Serban immediately hid in the laundry room located close by and called Mother telling her she was scared because she thought somebody might be in the house. Mother advised Serban to call the Bredemeyers, their neighbors who lived across the street, but despite her recommendation, Mother decided to make the phone call herself.

As soon as Serban finished talking to Mother, she came out of the laundry room and she heard Sivley say "[H]ello." (Tr. p. 120). She went downstairs and they met in the living room. Serban could tell that Sivley was angry. Serban told Sivley that he was not allowed to be there, but he responded "[Y]es, I am." (Tr. p. 120) The next thing Serban remembered was Sivley pinning her body down on the couch, grabbing her phone and throwing it across the room. Sivley then told Serban, "[] [Y]ou pushed me to this. You deserve this. . . . I thought you were worth it." (Tr. p. 122). Serban asked him to stop and she tried to push him off but he was too strong for her. Finally, Serban managed to escape and run to her bedroom, but Sivley caught up with her before she could lock the door and knocked her

4

down on the ground. Sivley pinned Serban on the ground, held her by her wrists with one hand, and started touching her breast and vagina with the other hand. Next, he pulled off Serban's pajamas and underwear and told her that he knew she "liked it rough" and that she "deserve[d] it." (Tr. p. 125). At that point, Serban asked Sivley "[A]re you going to rape me now?" (Tr. p. 126). Sivley responded in the negative. Sivley got up, backed away, and told Serban to calm down. Sivley then asked Serban if they could talk. Serban pulled her pajamas back on and agreed to talk. As they were talking, Serban explained to Sivley that their relationship ended in February 2013. Again, Sivley became angry and he pushed her on the bed. They struggled for a while before Sivley calmed down, and said that he would leave if she gave him back the things he had given her. So Serban returned the diamond necklace Sivley offered her on Valentine's Day, as well as a shirt and a jacket. Serban then asked Sivley where he had put her phone and he told her it was in her room. The phone was not there, so Serban quickly followed him out. She caught up with Sivley outside their house. At that point, James Bredemeyer and his son were also standing there. James Bredemeyer asked Sivley what he was doing at the residence, to which Sivley responded, "[A]pparently I'm leaving." (Tr. p. 237). Since Serban could not find her phone, she asked Sivley to go back inside and find it. He agreed and went back inside to look for it. Meanwhile, Serban and the Bredemeyers waited outside, but Sivley never returned. Sivley ran out through the basement's back door, managed to get to his car parked down the street, and drove off.

On May 16, 2013, the State filed an Information charging the Sivley with: Count I, sexual battery, a class D felony, I.C. § 35-42-4-8; Count II, criminal confinement, a Class

D felony, I.C. § 35-42-3-3; Count III, residential entry, a Class D felony, I.C. § 35-43-2-1.5; Count IV, battery, a Class A misdemeanor, I.C. § 35-42-2-1; and Count V, interference with reporting of a crime, a Class A misdemeanor, I.C. § 35-45-2-5.

A jury trial was held on August 28, 2013. At the close of the evidence, the jury found Sivley not guilty on Counts I and V, but returned a guilty verdict on Counts II, III, and IV. On September 17, 2013, the trial court sentenced Sivley to concurrent terms of three years each on Counts II and III, and six months on Count IV; with two-and-a-half years executed and six months suspended on Counts II and III.

Sivley now appeals. Additional information will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

Sivley argues that the State presented insufficient evidence to support his conviction for residential entry. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Atteberry v. State*, 911 N.E.2d 601, 609 (Ind. Ct. App. 2009). Instead, we consider only the evidence supporting the conviction and the reasonable inferences to be drawn therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the verdict will not be disturbed. *Baumgartner v. State,* 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

6

Accordingly, the question on appeal is whether the inferences supporting the verdict were reasonable, not whether, "more reasonable" inferences could have been made. *Thompson v. State*, 804 N.E.2d 1146, 1150 (Ind. 2004). Because reaching alternative inferences is the function of the trier of fact, we cannot reverse a conviction merely because a different inference might plausibly be drawn from the evidence. *Id.*

To convict Sivley of residential entry, the State must prove beyond a reasonable doubt that Sivley (1) knowingly or intentionally; (2) broke and entered; (3) into the dwelling of another person. I.C. § 35-43-2-1.5. Sivley does not dispute that he was at the Serbans' residence on the night in question. Rather, Sivley argues that because Mother had given him permission to come into the house on May 12, 2013 to open the door for the Comcast technician, he had permission to be at the residence, and the only issue here was a question of the timing.

Lack of consent is not an element of residential entry that the State is required to prove. *Griesinger v. State,* 699 N.E.2d 279, 282 (Ind. Ct. App. 1998). Instead, the defendant has the burden of raising consent as a defense. *Id.* Once the defense is raised, the State has the burden of disproving the defense beyond reasonable doubt. *Id.* A defendant's belief that he has permission to enter must be reasonable in order for the defendant to avail himself of the defense of consent. *Id.*

We now turn to the evidence most favorable to the jury verdict in this case. While Sivley does not dispute being in the residence on the night in question, his argument relies heavily on the fact that he had consent to enter the residence on May 12. We disagree. While it is undisputed that Sivley had permission to enter the residence on May 12, 2013

for the specific purpose of letting the Comcast technician, he did not have express permission from Mother or Serban, to be at the residence on May 11, 2013. Though Sivley was at the residence on May 11, he left residence after he assisted Mother in moving a table she had sold on Craig's List. At trial, Mother unequivocally testified that she had requested Sivley to be at the residence solely on May 12 to let in the Comcast technician. She also testified that she did not give Sivley permission to be at the residence at any other time. Mother gave Sivley instructions on how to gain access to the house on May 12, not on May 11. Also, she testified that Sivley neither had a key to the house nor the alarm code combination. Based on the fact that Sively left the residence on May 11, and only had specific instruction to be at the residence on May 12, supports the finding that he did not have consent to be at the residence on that night.

Furthermore, when Serban heard her bedroom door open and shut, she knew an unwelcome person was inside the house. We find no evidence showing that Serban explicitly invited Sivley into the residence. Once Sivley was inside the residence, the situation quickly escalated to a conflict. Also, when Serban asked him to leave, he refused to do so. Here, the evidence shows that Sivley was angry at Serban, and going over to the residence had nothing to do with the arrangement he had with Mother to let the Comcast technician into the residence. The evidence in fact presupposes that the only reason why Sivley was at the residence on May 11 was because he was upset with Serban, and he just wanted to confront her.

Looking at the evidence before us, we find that Sivley's argument that he had permission to be in the home fails. Serban's and Mother's testimony was sufficient to

8

prove beyond a reasonable doubt that Sivley knowingly and intentionally broke into entered their residence. Furthermore, we find that Sivley's consent argument amounts to nothing more than an invitation for this court to reweigh the evidence and asses witness credibility, which we will not do. *See Drane*, 867 N.E.2d at 146.

## CONCLUSION

Based on the foregoing, we find that there was sufficient evidence beyond a reasonable doubt to convict Sivley of the instant offense.

Affirmed.

ROBB, J. and BRADFORD, J. concur