## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 12 2016, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Donn Lee Rupert, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 12, 2016 <br><br> Court of Appeals Case No. 71A03-1507-CR-918 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Jerome Frese, Judge <br><br> Trial Court Cause No. 71D03-1410-FA-14 |

**Altice, Judge.**

**Case Summary**

[1] Following a jury trial, Donn Lee Rupert was convicted of class A felony child molesting, class C felony child molesting, and class D felony child solicitation. On appeal, Rupert presents the following issues:

> I. Did the trial court abuse its discretion in admitting the victim's recorded statement pursuant to Ind. Code § 35-37-4-6, also known as the Protected Person Statute (PPS)?

> II. Did the State present sufficient evidence to support Rupert's convictions?

[2] We affirm.

### Facts & Procedural History

[3] M.F. was born in 2007. In 2009, M.F. and his younger brother, I.F., lived in a house on Victoria Street in South Bend with their mother, L.T. (Mother), maternal grandmother, T.T. (Grandmother), and Rupert, who was Grandmother's boyfriend. The house on Victoria Street had a basement, but no garage. In 2011, when M.F. was around four years old, the family moved to a house on Kendall Street, which had both a basement and a garage. During the time the family lived together, Rupert, who M.F. and I.F. called "Grandpa Donn," helped care for the boys. There were occasions when Rupert was alone with the boys, and Rupert would sometimes watch them early in the morning so Grandmother and Mother could sleep in.

[4] Mother and the boys lived at the Kendall Street address for about six months before moving into their own apartment. On the morning of December 8,

2012, Mother's friend, Lauren Alex Swetcoff, was babysitting M.F. and I.F. while Mother was sleeping. When Swetcoff went to check on the boys, she found them in a closet "taking turns putting each other's penises in their mouths." *Transcript* at 255. Swetcoff told the boys to come out of the closet and then woke Mother and told her what she had seen. Mother was upset, and Swetcoff advised her to speak to the boys calmly to try to figure out what had happened. Swetcoff further advised Mother that she should not make the boys feel like they were in trouble. Later that day, Mother took the boys to McDonald's to talk about the incident in the closet. The content of this conversation prompted Mother to make a report to authorities that same day.

[5] As a result of Mother's report, both I.F. and M.F. were interviewed by Sara Jane Wisthuff at the CASIE Center in South Bend. M.F. was five years old at the time. M.F. told Wisthuff that his grandpa who lived with Grandmother— i.e., Rupert—had touched M.F.'s "pee pee" and sucked on it on more than one occasion in the basement and the garage. *State's Exhibit* 7. M.F. also said that Rupert made M.F. touch Rupert's "pee pee" and tried to make him suck it but he refused. He also stated that Rupert had touched his "butt." *Id.*

[6] Following M.F.'s disclosures, police attempted to locate Rupert, but were unable to do so for approximately eleven months. During this period, Mother stopped responding to police efforts to contact her, and she subsequently moved out of state, leaving the boys with family. When Rupert was located in October 2013, the State charged him with two counts of class A felony child molesting,

one count of class C felony child molesting, and one count of class D felony child solicitation.

[7] On April 7, 2015, Rupert took M.F.'s deposition. At that time, M.F. was eight years old. M.F. testified that Grandpa Donn was "a jerk" because of an incident involving M.F.'s dog. *Transcript* at 392. Aside from the dog incident, M.F. testified that Grandpa Donn had "[n]ot really" done anything bad to him. *Id.* at 394.

[8] On May 1, the State filed a notice of intent to introduce a video recording of Wisthuff's interview with M.F. pursuant to the PPS. A PPS hearing was held on May 13, 2015. M.F. testified at the hearing, and when defense counsel confronted him with his deposition testimony, M.F. stated that the incident with the dog was actually not the only bad thing Rupert had done to him. Defense counsel did not question M.F. further on this subject.

[9] The next day, the trial court ruled that M.F.'s recorded interview was admissible pursuant to the PPS. A three-day jury trial commenced on May 15, 2015, during which M.F.'s recorded interview was admitted over objection. At the conclusion of the evidence, Rupert was found guilty on all counts except for one of the class A felony child molesting charges. Rupert now appeals.

### I. Admissibility under the Protected Person Statute

[10] Rupert first argues that the trial court abused its discretion by admitting M.F.'s recorded statement into evidence pursuant to the PPS. As with challenges to

the admissibility of other evidence, the decision to admit a statement under the PPS will not be reversed without a showing of a manifest abuse of discretion by the trial court resulting in the denial of a fair trial. *Mishler v. State*, 894 N.E.2d 1095, 1099 (Ind. Ct. App. 2008), *trans. denied*. We will find an abuse of discretion only where the trial court's action is clearly against the logic and effect of the facts and circumstances before it. *Id.* However, because the protected person statute "impinges upon the ordinary evidentiary regime[,]" a trial court's responsibilities thereunder carry with them "'a special level of judicial responsibility.'" *Carpenter v. State*, 786 N.E.2d 696, 703 (Ind. 2003) (quoting *Cox v. State*, 706 N.E.2d 547, 551 (Ind. 1997)).

[11] The PPS provides a list of conditions under which evidence that would otherwise be inadmissible will be allowed in cases involving certain crimes against "protected persons." *J.A. v. State*, 904 N.E.2d 250, 255 (Ind. Ct. App. 2009), *trans. denied*. A "protected person" is defined, in relevant part, as "a child who is less than fourteen (14) years of age[.]" I.C. § 35-37-4-6(c)(1). The PPS provides that a statement or videotape that: (1) is made by a person who at the time of trial is a protected person; (2) concerns an act that is a material element of a listed group of offenses (including sex crimes) that was allegedly committed against that person; and (3) is not otherwise admissible into evidence, is admissible if certain requirements are met. I.C. § 35-37-4-6(d).

[12] One such requirement is that the protected person must either testify at trial or be determined to be unavailable as a witness within the meaning of the PPS. I.C. § 35-37-4-6(e)(2). Additionally, the trial court must find, in a hearing

conducted outside the presence of the jury and attended by the protected person, "that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability." I.C. § 35-37-4-6(e). Rupert challenges the trial court's findings on both of these requirements.

[13] As it pertains to this case, a protected person is unavailable as a witness if,

> [f]rom the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate.

I.C. § 35-37-4-6(e)(2)(B)(i). In this case, Dr. Victor Tan, a psychologist who had worked extensively with M.F., opined that, if required to testify in Rupert's presence, M.F. would suffer emotional distress such that he would be unable to reasonably communicate what had occurred. Specifically, Dr. Tan testified that M.F. is friendly and does not show outward distress, but he has a fragile sense of security and has difficulty communicating when he is uncomfortable. Dr. Tan stated that when he had spoken with M.F. about the possibility of testifying, M.F. sometimes said that he was comfortable with it, but other times expressed reservations or did not want to talk about it. Dr. Tan testified further that the fact that M.F. was not communicative about the molestation during the deposition was consistent with his experience with M.F. When Dr. Tan began working with M.F., M.F. would often say he did not remember things, change the subject, or ignore Dr. Tan rather than discuss uncomfortable subjects. Even in a therapeutic setting, it took M.F. about eight months to be able to tell his

brother and grandfather what had happened to him.  Dr. Tan testified that he anticipated that M.F. would be traumatized and revert to his defense strategy of shutting down.  This is ample evidence to support the trial court's finding that M.F. was unavailable for the purposes of the PPS, and Rupert's arguments to the contrary are nothing more than requests to substitute our judgment for that of the trial court, which we will not do.[1]

[14] Next, Rupert argues that M.F.'s recorded statement did not bear sufficient indicia of reliability to support its admission pursuant to the PPS.  Factors to be considered by the trial court in determining the reliability of a statement under the PPS include: the time and circumstances of the statement, whether there was a significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, use of age-appropriate terminology, spontaneity, and repetition.  *Taylor v. State*, 841 N.E.2d 631, 635 (Ind. Ct. App. 2006), *trans. denied*.  Additionally, "[l]engthy and stressful interviews or examinations preceding the statement may cast doubt on the reliability of the statement or videotape sufficient to preclude its admission."  *Pierce v. State*, 677

---

[1] Rupert makes a number of assertions concerning M.F.'s purportedly confident and outgoing demeanor while testifying at the protected person hearing.  However, Rupert's claims are unsupported by the record because no video recording was made of the hearing.  The trial court, as the fact-finder on this issue, is in a unique position to observe the demeanor of witnesses, and we therefore afford their judgments in that regard deference.  *See D.C. v. J.A.C.*, 977 N.E.2d 951, 956-57 (Ind. 2012) (noting that appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence" (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)).  In any event, even if we accept Rupert's claims concerning M.F.'s demeanor as true, they are in keeping with Dr. Tan's description of M.F.'s personality and coping mechanisms.

N.E.2d 39, 44 (Ind. 1997). There are undoubtedly many other relevant factors to consider in individual cases. *Id.*

[15] Rupert first argues that the recorded interview is not sufficiently reliable because it gives no indication of when the molestation actually occurred. Our Supreme Court has noted that "passage of time tends to diminish spontaneity and increase the likelihood of suggestion." *Id.* at 45. Nevertheless, the passage of time between an alleged molestation and a recorded statement is only one factor to be considered and is not necessarily dispositive. *See Mishler*, 894 N.E.2d at 1101.

[16] The precise dates of M.F.'s molestation are unclear. Although M.F. did not give the dates of the molestations, his description of the locations where the incidents occurred—in the basement and the garage—suggest that they occurred when the family lived at the Kendall Street address. Indeed, the charging information alleged that the molestations took place between December 2011 and December 2012, which coincides with the time the family lived on Kendall Street. M.F.'s recorded statement was made in December 2012. Thus, the molestations could have occurred anywhere from just days to one year before M.F.'s initial disclosure. Although the passage of time between an alleged molestation and a victim's disclosure generally weighs against a finding of reliability, this court has affirmed a trial court's decision to admit a victim's statement made after a longer delay. *See Ennik v. State*, 40 N.E.3d 868, 879 (Ind. Ct. App. 2015) (affirming admission of statement pursuant to the PPS

where "anywhere from nine to twenty-two months passed between the actual molestation and [the victim's] initial disclosure"), *trans. denied*.

[17] Rupert also asserts that there was a significant opportunity for coaching by Mother, but he does not develop this argument with citation to authority or the record. Nevertheless, we note that the opportunity for coaching arises after the victim's initial disclosure. *Nunley v. State*, 916 N.E.2d 712, 718 (Ind. Ct. App. 2009), *trans. denied*. Here, M.F. made his initial disclosure on December 8, 2012, and the recorded statement was made three days later on December 11, 2012. This court has affirmed the admission of recorded statements pursuant to the PPS under similar circumstances. *See M.T. v. State*, 787 N.E.2d 509, 513 (Ind. Ct. App. 2003) (finding statement admissible under the PPS where two days passed between child's initial disclosure and interview). We note further that M.F.'s use of age-appropriate language during the interview suggests that he had not been coached. Specifically, when Wisthuff asked M.F. if Mother was worried about something, M.F. stated that Rupert had "sucked" his "pee pee" in the garage and the basement. *State's Exhibit* 7. In response to Wisthuff's questions, M.F. disclosed further that Rupert had made M.F. touch Rupert's "pee pee" and tried to make him "suck" it and that Rupert had touched M.F.'s "butt." *Id.* M.F. described Rupert's "pee pee" as "big" and with a "brown beard." *Id.* M.F. repeated his description of events several times during the interview while continuing to use age-appropriate language.

[18] Rupert also argues that Mother and M.F. each had a motive to fabricate the allegations. With respect to Mother, Rupert makes no claim that there was any

animosity between them or that she bore him any ill will. Instead, he claims that in light of Mother' background, she "certainly . . . could have coached M.F. to make allegations against someone else to deflect the focus on her unstable lifestyle." *Appellant's Brief* at 17. This argument is entirely speculative and ultimately unconvincing. Rupert has not directed our attention to any evidence suggesting that DCS or the police were involved in Mother's life until she contacted authorities following M.F.'s disclosure of the molestation. Rupert's suggestion that Mother made the report to deflect attention that she was apparently not receiving is puzzling, to say the least. Indeed, by making the report, Mother invited authorities into her life and exposed herself to investigation by both DCS and the police.

[19] With respect to M.F., Rupert claims that M.F. knew Mother was upset about the incident in the closet and argues that M.F. "very well could have implicated someone else to eliminate questions into his own conduct." *Id.* at 18. We note that M.F. testified at the PPS hearing that he got in trouble when the babysitter caught him and I.F. in the closet together and that Mother was angry with him. However, other evidence presented at the PPS hearing indicates that after Swetcoff discovered M.F. and I.F. in the closet, she woke Mother to tell her what she had seen. Mother was upset, but Swetcoff advised her to talk to the boys calmly without scaring them or making them think they were in trouble in order to determine what had happened. Later that day, Mother took the boys to McDonald's to discuss the incident, and she contacted authorities that same day. Moreover, during M.F.'s interview at the CASIE Center, Wisthuff

repeatedly assured M.F. that he was not in trouble. Accordingly, the trial court was within its discretion to conclude that M.F. did not have a strong motive to fabricate.

[20] Finally, Rupert makes a vague suggestion that Wisthuff asked leading questions during the recorded interview. Specifically, he asserts that "[r]ather than asking open ended questions, the interviewer rests upon statements made by M.F. to further develop Rupert as a suspect." *Id*. It is unclear to us what Rupert means by this assertion, and he gives no specific examples of any objectionable questions. Our review of the recorded statement leaves us with no doubt that Wisthuff was a skillful interviewer and very careful to ask open-ended, non-leading questions. Rupert's argument in this regard is without merit.[2]

[21] Based on our review of the record, we cannot conclude that the trial court's finding that M.F.'s recorded statement bore sufficient indicia of reliability to be admissible pursuant to the PPS was clearly against the logic and effect of the

---

[2] Rupert also argues that a number of "extrinsic factors" negatively affect the reliability of M.F.'s statement. *Appellant's Brief* at 17. In support of this claim, Rupert directs our attention to Grandmother's testimony indicating that Mother had provided an unstable living environment for the boys that allowed them to be exposed to pornography, sexual activity, and other inappropriate situations. We note, however, that Rupert did not present evidence of these so-called "extrinsic factors" at the PPS hearing. Indeed, the testimony supporting Rupert's factual claims in this regard was not presented until after the recorded interview was admitted into evidence at trial, and Rupert did not renew his previous objection to the admission of the recorded interview on the basis of such evidence. Furthermore, Rupert has made no attempt on appeal to explain how or why these factors would have any bearing on the reliability of M.F.'s statement. *See Wingate v. State,* 900 N.E.2d 468, 475 (Ind. Ct. App. 2009) (explaining that a party waives an issue where the party fails to support his argument with cogent argument). For all of these reasons, we find Rupert's argument in this regard waived.

facts and circumstances before it. Because Rupert has not established that the trial court's finding in this regard was an abuse of discretion, he is not entitled to reversal on this basis.

## II. Sufficiency of the Evidence

[22] Rupert also argues that the State presented insufficient evidence to support his convictions. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Atteberry v. State*, 911 N.E.2d 601, 609 (Ind. Ct. App. 2009). Instead, we consider only the evidence supporting the conviction and the reasonable inferences flowing therefrom. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, the judgment will not be disturbed. *Baumgartner v. State*, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the conviction. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). The uncorroborated testimony of a victim alone is sufficient to support a conviction. *Jenkins v. State*, 34 N.E.3d 258, 262 (Ind. Ct. App. 2015), *trans. denied*.

[23] M.F.'s recorded statement is sufficient to support Rupert's convictions. Nevertheless, Rupert directs our attention to M.F.'s deposition testimony and the lack of corroborating or physical evidence that any molestation occurred.

In other words, Rupert argues that we should credit conflicting evidence in his favor. We will not indulge his blatant request to reweigh the evidence.

[24] Judgment affirmed.

[25] Bailey, J. and Bradford, J., concur.