## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 12 2017, 7:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Armando M. Bruno, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 12, 2017 <br><br> Court of Appeals Case No. <br> 14A01-1606-CR-1530 <br><br> Appeal from the Daviess Superior Court <br><br> The Honorable Dean A. Sobecki, Judge <br><br> Trial Court Cause No. <br> 14D01-1502-FA-172 |

**Altice, Judge.**

**Case Summary**

Following a jury trial, Armando M. Bruno was convicted of two counts of child molesting as Class A felonies and two counts of child molesting as Class C felonies. Bruno was sentenced to an aggregate term of eighty years imprisonment. Bruno presents five issues for our review, which we restate as:

> 1. Did the trial court abuse its discretion in admitting Bruno's recorded statement into evidence?
>
> 2. Did the trial court abuse its discretion in excluding certain evidence pursuant to the Rape Shield Rule?
>
> 3. Is the evidence sufficient to support Bruno's Class A felony child molesting convictions?
>
> 4. Did the trial court err in sentencing Bruno?
>
> 5. Is Bruno's sentence inappropriate?
>
> 6. Did the trial court abuse its discretion in ordering Bruno to pay restitution to the State?

We affirm in part and reverse in part.

## Facts & Procedural History

Bruno was born on December 4, 1959 and is a native of Guatemala. Bruno came to the United States in 2003. In 2006, Bruno became the pastor of a small church in Washington, Indiana. Initially, Bruno lived with a family at their home on Grand Avenue, and Bruno's church met in the family's basement. The family had a six-year-old son, D.A., who was born in December of 2000.

[4] Bruno had an extremely close relationship with the family and would often care for D.A. and his siblings while D.A.'s parents were away. One evening during the time Bruno lived with D.A.'s family and while Bruno was babysitting D.A., Bruno called D.A. into D.A.'s room. After D.A. complied with Bruno's instructions to pull his pants down and bend over his bed, Bruno inserted his penis into D.A.'s anus. The assault ended abruptly when the phone rang. Bruno instructed D.A. to go to the bathroom and clean himself before his parents returned.

[5] After approximately a year of operating the church out of the family's basement, D.A.'s family purchased a building on Main Street to house Bruno's church. Bruno had a room in the building and thus, moved from the family's home. Even after Bruno moved from the family's home, he visited D.A. and the family daily and would spend the night at their house on a regular basis.

[6] At some point D.A.'s family moved from the Grand Avenue home. Shortly thereafter, D.A. told his father about what Bruno had done to him— specifically, that Bruno had placed his penis in his anus. D.A.'s father confronted Bruno, who denied the inappropriate encounter and claimed that D.A. was lying and was possessed by the devil. Bruno shared with D.A.'s father an excerpt from a book titled "Lucifer Dethroned" and convinced him that D.A. "was in bad shape." *Transcript Vol. I* at 133. D.A.'s father apologized to Bruno and did not further pursue D.A.'s allegation.

After moving from the Grand Avenue home, D.A. and his family moved to a home on John Street and then moved in with D.A.'s maternal grandparents for a short time. D.A. maintains that Bruno did not assault him while the family lived at either of these locations. In June or July of 2010, D.A.'s family moved into a three-bedroom mobile home in Southview Homes in Washington. Bruno continued his close relationship with D.A.'s family and would often visit and stay overnight at the Southview home. When Bruno stayed over, he would sleep in the room closest to the children's room.

Within weeks after D.A.'s family moved to the Southview home, Bruno resumed his sexual assaults of D.A. Over the course of the next four years, Bruno repeatedly sexually assaulted D.A. The assaults occurred at night when Bruno would go into the room D.A. shared with his siblings. While D.A.'s siblings were sleeping, Bruno would fondle D.A.'s penis with his hand or have D.A. touch his penis and masturbate him. On more than fifteen occasions, Bruno had D.A. bend over his bed and then Bruno inserted his penis into D.A.'s anus. D.A. reported that Bruno would put a cream or his own saliva on his own penis before doing so. Bruno would ejaculate during some of the encounters, and D.A. would then go to the bathroom to clean himself. Bruno told D.A. not to tell anyone about their encounters or he would "do it harder." *Id.* at 211.

In the summer of 2014, when D.A. was thirteen years old, D.A. told his father about the ongoing sexual abuse perpetrated by Bruno. D.A.'s father, along with D.A., confronted Bruno, who again denied all of D.A.'s allegations. D.A.

began to cry and, pointing at Bruno, implored, "You know the truth." *Id*. at 138. After D.A. left the room, Bruno then began to cry and admitted to D.A.'s father that he had touched D.A. and asked D.A.'s father for forgiveness.

[10] About a month later, Bruno met with D.A.'s parents at the family's Southview home. Unbeknownst to Bruno, D.A.'s father recorded the conversation. Bruno admitted he was guilty of unspecified acts and begged for the family's forgiveness. After this meeting, Bruno sent text messages to D.A.'s father apologizing and acknowledging again that he was "guilty of what occurred." *State's Exhibit 16.*

[11] D.A.'s father did not immediately report the molestation out of concern for the church and because Bruno was seeking forgiveness. Approximately six months later, Bruno made disparaging comments about D.A.'s family to the church congregation and as a result, D.A.'s family decided to leave the church. On January 30, 2015, D.A. and his father went to the police station to report the sexual abuse.

[12] After receiving the report, Detective Daniel Christie of the Washington City Police Department, along with other officers, went to Bruno's house. It was late and Bruno was asleep. Bruno was asked if he would come to the police station and answer some questions, and he agreed. After Bruno changed his clothes, he was transported to the police station in the back of a patrol car. Bruno was never placed in handcuffs. Once at the police station, Bruno was

placed in an interview room. Bruno speaks, reads, and writes very little English, so he was provided with an interpreter for the interview.

[13] Before the interview began, the interpreter translated an advisement of rights and waiver form to Bruno as Detective Christie read it aloud. Bruno nodded indicating he understood his rights and the waiver thereof. Detective Christie then asked him to sign the form indicating his understanding. Bruno signed the written waiver form, which was written entirely in English. During the interview, Bruno admitted to Detective Christie that he had fondled D.A.'s penis and D.A. had touched his penis on several occasions. Bruno claimed that he never hurt D.A., but admitted that he knew what he was doing was wrong. Bruno's entire statement to Detective Christie was recorded. Following his statement, Detective Christie arrested Bruno.

[14] During the investigation of D.A.'s allegations, the police were made aware of the conversation between Bruno and D.A.'s parents that D.A.'s father had recorded with his cell phone. After the recording was obtained, the State had the conversation translated and transcribed.

[15] On February 4, 2015, the State charged Bruno with one count of child molesting as a Class A felony (Count I) and two counts of child molesting as Class C felonies (Counts II and III). The State later filed an additional count of Class A felony child molesting (Count IV) and two additional counts of Class C felony child molesting (Counts V and VI). Prior to trial, the court granted the

State's oral motion to dismiss Counts II and III. Counts IV, V, and VI were renumbered as Counts II, III, and IV respectively.

[16] On February 18, 2016, Bruno filed a motion to suppress his statement to police alleging that he did not knowingly waive his *Miranda* rights. Initially, Bruno claimed that he was never advised of his rights, but after he was confronted with the recording of his interview, he acknowledged that his rights may have been read to him. Bruno also argued that his signature on the waiver of rights form is of no import because the waiver form is written in English. After a hearing, the trial court denied the motion, finding that Bruno was properly advised and voluntarily waived his rights. At trial, Bruno objected to admission of his statement on the same grounds. The trial court overruled Bruno's objection.

[17] On March 28, 2016, Bruno filed a motion requesting that he be permitted to introduce evidence of alleged past molestation of a witness, to which the State objected. At a hearing on this motion, Bruno claimed that D.A.'s mother and D.A.'s aunts had allegedly been molested by D.A.'s grandfather. Bruno asserted that he wanted to introduce such evidence to show that someone other than him, i.e., D.A.'s grandfather, molested D.A. The trial court denied Bruno's motion, finding such evidence inadmissible for several reasons.

[18] A four-day jury trial commenced on April 5, 2016, and concluded with the jury finding Bruno guilty as charged. The trial court held a sentencing hearing on June 2, 2016. In sentencing Bruno, the trial court identified several aggravating

factors. The "most important" aggravating factor for the court was Bruno's abuse of his position of trust as a pastor and as a family friend. *Transcript Vol. II* at 96. The court also noted that the acts were committed over a long period of time, D.A.'s young age at the time of the first molestation, and the excessive harm to D.A., both psychologically and physically. Although affording it little weight, the trial court also acknowledged Bruno's illegal immigration status. As mitigating, the trial court noted Bruno's lack of criminal history while living in the United States.

[19] Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced Bruno to consecutive terms of forty years imprisonment on Counts I and II, the Class A felony convictions. As to Counts III and IV, the Class C felony convictions, the trial court sentenced Bruno to concurrent terms of six years for each conviction and ordered the sentences be served concurrent with the forty-year sentence for Count II. The trial court also ordered Bruno to pay $5,000 in restitution to the State for transcription and translation expenses incurred with regard to the recorded conversation between Bruno and D.A.'s family. Bruno now appeals. Additional facts will be provided as necessary.

## 1. Admission of Evidence

[20] Bruno argues that the trial court abused its discretion in admitting his statement to police. Our standard of review is well-settled.

> The trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse the trial court's ruling only when the trial court abuses that discretion. *Fuqua v. State*, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), *trans. denied*. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id*. Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we may also consider any undisputed evidence that is favorable to the defendant. *Id*. Additionally, we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial evidence. *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

*Hicks v. State*, 5 N.E.3d 424, 427 (Ind. 2014), *trans. denied*.

[21] Bruno argues that his statement was inadmissible because he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights.[1] A waiver of one's *Miranda* rights occurs when the defendant, after being advised of those rights and acknowledging that he understands them, proceeds to make a statement without taking advantage of those rights. *Ringo v. State*, 736 N.E.2d 1209, 1211-12 (Ind. 2000). As our Supreme Court has stated:

---

[1] As a precursor to this argument, Bruno argues that he was in custody for purposes of invoking the protections afforded by *Miranda*. The State argues that Bruno was not in custody. Herein, we will assume, without deciding, that Bruno was in custody when he was interviewed by Detective Christie.

[t]he admissibility of a confession is controlled by determining from the totality of the circumstances whether the confession was made voluntarily and was not induced by violence, threats, or other improper influences that overcame the defendant's free will. *See Wilcoxen v. State*, 619 N.E.2d 574, 577 (Ind. 1993). The same test determines whether *Miranda* rights were voluntarily waived. *See Gregory v. State*, 540 N.E.2d 585, 592 (Ind. 1989). Thus, the voluntariness of a defendant's waiver of rights is judged by the totality of the circumstances. *See Allen v. State*, 686 N.E.2d 760, 770 (Ind. 1997), *cert. denied*, 525 U.S. 1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999).

*Id*. at 1212. A signed waiver form is one item of evidence showing the accused was aware of and understood his rights. *Id*. An express written waiver of rights, however, is not necessary to establish a waiver of *Miranda* rights. *Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000).

[22] Bruno presents his challenge under both the United States and Indiana Constitutions. Under the United States Constitution, the State must prove the statement was voluntarily given by a preponderance of the evidence. *Malloch v. State*, 980 N.E.2d 887, 901 (Ind. Ct. App. 2012) (citing *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005)), *trans. denied*. The Indiana Constitution, however, requires the State to prove beyond a reasonable doubt that the defendant voluntarily waived his rights and that the confession was voluntarily given. *Id*.

[23] Bruno first argues that the interpretation of his rights was deficient because the interpreter told him that his statements "could be used against him," *Transcript*

*Vol. I* at 46,[2] rather than "can and will" be used against him as required by *Miranda*, 384 U.S. at 469.

[24] Our Supreme Court has previously held that the omission of the word "will" did not create a fatal variance so as to require suppression of the defendant's statement. *See Myers v. State*, 510 N.E.2d 1360, 1365 (Ind. 1987); *see also Santana v. State*, 679 N.E.2d 1355, 1358 (Ind. Ct. App. 2007). In both cases, the courts relied upon the fact that the advisements were in all other respects in conformance with *Miranda* and the fact that circumstances surrounding the defendant's waiver indicated the defendants voluntarily waived their rights. Here, the same result obtains. There is perhaps some error in the Spanish translation of Bruno's *Miranda* rights, but Bruno himself acknowledges that he was at least advised in Spanish that his statement "could" be used against him. Bruno makes no other challenge to the accuracy of the advisement of his rights or waiver thereof.

[25] With regard to the circumstances surrounding his interview, the record clearly reflects that Detective Christie read Bruno his *Miranda* rights and the standard waiver language and that an interpreter translated those rights into Spanish. Detective Christie stated multiple times that he wanted to make sure Bruno understood his rights and the interpreter conveyed such statements to Bruno.

---

[2] At the suppression hearing, a different Spanish-language interpreter was asked to translate how the interpreter during the interview translated to Bruno what Detective Christie was saying. This is that interpreter's translation.

Although Bruno had varying responses, both verbal and non-verbal, he never indicated or demonstrated that he did not understand his rights as they were interpreted for him. It was also explained to Bruno that signing the advisement of rights form, although written in English, was an acknowledgment that he understood his rights.[3] Bruno then signed the advisement of rights form and proceeded to voluntarily answer Detective Christie's questions. There is nothing in the record that suggests Detective Christie engaged in any violent, coercive, or threatening conduct prior to or during his interview of Bruno.

[26] Bruno also makes much of the fact that the written advisement form that he signed was in English. As noted above, while a signed waiver form is one item of evidence showing the accused was aware of and understood his rights, an express written waiver is not necessary to establish a waiver of *Miranda* rights. *Carter v. State*, 730 N.E.2d at 157; *cf. Morales v. State*, 749 N.E.2d 1260, 1267 (suggesting in dicta that "both the defendant's rights and effective law enforcement would be better served if standardized forms containing *Miranda* warnings and waivers written in Spanish were created and distributed to all law enforcement agencies"). Thus, the signed waiver form, whether in English or Spanish, was not necessary to establish that Bruno voluntarily waived his rights. The record makes clear that Bruno was orally advised in Spanish of the implications of signing the waiver form and that he indicated that he was

---

[3] As interpreted at the suppression hearing, Bruno was told "Okay. You understand your rights and you can sign." *Transcript, Volume 1* at 47.

willing to talk to Detective Christie. Bruno then signed the form and voluntarily answered Detective Christie's questions. It is evident from the record that Bruno understood and voluntarily waived his rights. The fact that the waiver form was written in English does not change this result.

[27] We further note that Bruno is an adult who was educated through the 11th grade and can speak, read, and write in Spanish. Bruno came to the United States in 2003 and has served as a pastor of his own church. Bruno did not appear distressed or confused at the time of the interview. Further, he did not seek clarification during the simultaneous translation of the interview. In fact, he even challenged some of the questions that he felt were unfair.

[28] There is nothing in the record to suggest that Bruno's statement was induced by violence, threats, or other improper influences that overcame his free will. Bruno was clearly advised of his rights and waiver thereof in Spanish prior to answering Detective Christie's questions. Considering the totality of the circumstances, we conclude that the State has proved beyond a reasonable doubt that Bruno knowingly, voluntarily, and intelligently waived his rights.[4] The trial court did not abuse its discretion in admitting Bruno's statement into evidence.

---

[4] Having concluded that the State proved beyond a reasonable doubt that Bruno voluntarily waived his rights for purposes of the Indiana Constitution, it follows that there is likewise no violation under the preponderance of the evidence standard for review of such claims under the United States Constitution.

## 2. Exclusion of Evidence - Rape Shield Statute

[29] Bruno argues that the trial court abused its discretion in excluding evidence that another person may have perpetrated the sexual abuse against D.A. Specifically, Bruno sought to introduce evidence that D.A.'s grandfather allegedly molested D.A.'s mother and aunts when they were younger. Bruno notes that D.A. and his family resided in D.A.'s grandfather's home shortly after D.A. made the first allegations against Bruno. As part of his defense, Bruno wanted to suggest that it was D.A.'s grandfather who perpetrated the acts of molestation and was responsible for any injury to D.A.

[30] Ind. Evidence Rule 412, also known as the Rape Shield Rule, generally bars the admission of evidence regarding a victim's or witness's prior sexual conduct. Evid. Rule 412 sets out very limited exceptions to this rule with regard to admission of evidence in a criminal case. Specifically, Rule 412(b)(1)(A) does not bar the admission of evidence of "specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." *See also* Ind. Code § 35-37-4-4 (Rape Shield Act); *Sallee v. State*, 785 N.E.2d 645, 651 (Ind. Ct. App. 2003) (noting that "[t]o the extent there is a difference between the two, the rule controls").

[31] This exception to the Rape Shield Rule is not applicable in this case. Bruno claims, without any supporting evidence, that D.A.'s mother disclosed to him that D.A.'s grandfather had molested her and her sisters when they were

younger. As found by the trial court in denying Bruno's motion seeking to proffer such evidence, such allegations were at least hearsay as it concerned D.A.'s aunts. Secondly, Bruno offered no "specific instances" of sexual behavior by D.A.'s grandfather toward D.A.'s mother and his aunts other than his own self-serving allegations. Further, we note that the evidence Bruno sought to admit concerned matters that were remote in time and pertained to a different type of conduct. Bruno cannot show how such evidence has any bearing on any physical evidence introduced by the State relating to the source of semen in the victim, injury to the victim, or other physical evidence.

[32] Even if the evidence was erroneously excluded, the error was harmless. An error in the exclusion of evidence is harmless when its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *See Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014). Here, D.A. gave a clear account of what Bruno did to him and he never equivocated on the identity of his abuser. The first instance involving anal penetration occurred when D.A. was just six years old and prior to the time when D.A. and his family lived with D.A.'s grandfather. At the relevant times, Bruno had complete access to D.A. Further, Bruno admitted to D.A.'s father, in his statement to police, and in his testimony at trial that he had molested D.A. Whether the jury believed Bruno's denial of anal penetration or D.A.'s testimony that Bruno inserted his penis into D.A.'s anus is a matter of credibility as to those witnesses. Bruno's suppositions concerning D.A.'s grandfather's conduct toward D.A.'s mother and aunts

would have had no impact on such determination. Thus, any error in excluding the challenged evidence would have been harmless.

### 3. Sufficiency

[33]   Bruno argues that the State presented insufficient evidence to support his convictions for child molesting as Class A felonies.[5] In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Atteberry v. State*, 911 N.E.2d 601, 609 (Ind. Ct. App. 2009). Instead, we consider only the evidence supporting the conviction and the reasonable inferences flowing therefrom. *Id*. If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, the judgment will not be disturbed. *Baumgartner v. State*, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the conviction. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). The uncorroborated testimony of a victim alone is sufficient to support a conviction. *Jenkins v. State*, 34 N.E.3d 258, 262 (Ind. Ct. App. 2015), *trans. denied*.

---

[5] Acknowledging his admission to fondling D.A., Bruno does not challenge his convictions for child molesting as Class C felonies.

[34] To sustain Bruno's convictions for Class A felony child molesting, the State's evidence must have proved beyond a reasonable doubt that Bruno, who was at least 21 years of age, knowingly performed deviate sexual conduct with D.A., a child under the age of fourteen. *See* I.C. § 35-42-4-3. Deviate sexual conduct is an act involving "a sex organ of one (1) person and the mouth or anus of another person[] or (2) the penetration of the sex organ or anus of a person by an object."[6] Ind. Code § 35-31.5-2-94 (2014).

[35] Bruno argues that while he admitted to fondling D.A., he consistently denied any anal intercourse and further argues that D.A.'s testimony to the contrary lacked specificity and was incredibly dubious. Under the incredible dubiosity rule, a court will impinge upon the factfinder's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Whatley v. State*, 908 N.E.2d 276, 282 (Ind. Ct. App. 2009), *trans. denied*. In other words, the evidence presented must be so unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone. *Moore v. State*, 27 N.E.3d 749, 751 (Ind. 2015). We also note that application of this rule is limited to cases where a single witness presents inherently contradictory testimony which is equivocal or

---

[6] Bruno committed his crimes prior to the repeal of the deviate sexual conduct definition and replacement with the term "other sexual conduct." "Other sexual conduct" has an identical definition as deviate sexual conduct previously had. *See* Ind. Code § 35-31.5-2-221.5.

the result of coercion and there is a complete lack of circumstantial evidence of guilt. *Id.*

[36] Here, D.A. testified that Bruno performed anal sex on him numerous times throughout the years. D.A. described the first encounter as taking place at the Grand Avenue house where Bruno lived with D.A.'s family in 2006 and as repeatedly occurring from 2010 through 2013 when D.A.'s family lived in their Southview home. D.A.'s testimony that some of the encounters happened while his siblings slept in the same room is not an uncommon occurrence in child molesting cases, and unfortunately, not counter to human experience. There is nothing inherently contradictory or equivocal about D.A.'s testimony. Bruno's arguments simply amount to blatant requests for this court to reweigh the evidence and judge the credibility of witnesses. We will not indulge such a request on appeal.

### Sentencing

[37] Bruno challenges his sentence in two respects. He first argues that the trial court abused its discretion in finding aggravating circumstances and imposing consecutive sentences. He also argues that his sentence is inappropriate in light of the nature of the offense and his character. "As our Supreme Court has made clear, inappropriate sentence and abuse of discretion claims are to be analyzed separately." *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). We will address each in turn.

### 4. Abuse of Discretion

[38] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id*. "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id*. at 490 (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

[39] A trial court may abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id*. at 490-91. If the trial court abuses its discretion in one of these or another way, remand for resentencing is the appropriate remedy "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id*. at 491.

[40] Bruno's sole argument with respect to the aggravating circumstances is that the trial court abused its discretion when it found that the harm to D.A. exceeded that required for a conviction. *See* Ind. Code § 35-38-1-7.1(a)(1) (a trial court may consider harm, injury, loss, or damage suffered by the victim that is significant and greater than the elements necessary to prove the commission of the offense). Bruno maintains that the psychological impact of Bruno's actions

on D.A. was not out of the ordinary for a child subjected to such conduct. He further argues that the State presented no evidence linking any physical harm to Bruno's actions.

[41] With regard to the psychological harm, we note that Bruno was a spiritual leader who used his closeness with D.A.'s family to take advantage of D.A. beginning when D.A. was just six years old. Even after D.A. summoned the courage to tell his father of the abuse he suffered at the hands of Bruno, Bruno convinced D.A.'s father that D.A. was possessed by the devil, which destroyed D.A.'s trust in his father. Bruno later engaged in a pattern of sexual abuse of D.A. that involved anal penetration and having D.A. masturbate him. All the while, D.A. had to endure Bruno as his family's minister and as being treated like a member of the family. The testimony and evidence presented by the State at sentencing clearly demonstrates that the circumstances under which Bruno perpetrated his crimes had a significant psychological impact on D.A.

[42] With regard to physical harm, even Bruno acknowledges that the State presented evidence that D.A. suffered from and was treated for encopresis[7] and that encopresis can be a sign of sexual abuse. Bruno argues, however, that such is an improper aggravating circumstance in this case because the State presented no evidence linking this physical condition to Bruno's conduct. Despite the lack of an explicit connection between D.A.'s physical condition

---

[7] Encopresis is defined as "involuntary defecation." Dictionary.com, http://www.dictionary.com/browse/encopresis (last visited May 5, 2017).

and Bruno's conduct, there was ample evidence from which the trial court could have properly found the harm D.A. suffered was significant and greater than that necessary for the offense. D.A. recounted the numerous times Bruno anally penetrated him with his penis. D.A. told a nurse who examined him that it was "really hurting [his] bottom" and that he was "having problems when [he had] loose poop." *State's Sentencing Exhibit 1*. The trial court did not abuse its discretion in finding as an aggravating circumstance that the harm inflicted was greater than that required for the offense.

[43] Bruno next argues that the trial court abused its discretion in imposing consecutive sentences. Bruno maintains that the trial court fell short of the requirement that it explain its reasons for the sentence imposed by not explaining why the aggravating circumstances warranted consecutive sentences as opposed to simply enhanced concurrent sentences.

[44] Trial courts are permitted to impose consecutive sentences if warranted by the aggravating circumstances. *Monroe v. State*, 886 N.E.2d 578, 579 (Ind. 2008). In doing so, however, a trial court must articulate, explain, and evaluate the aggravating circumstances that support the sentence. *Id*. Where the trial court's sentencing statement lacks specificity with regard to an explanation for imposition of consecutive sentencing, remand for resentencing is not required where the rationale for consecutive sentences is apparent on the face of the record. *Lewis v. State*, 31 N.E.3d 539, 543 (Ind. Ct. App. 2015).

Here, in arguing for consecutive sentences, the State emphasized that this was not a single act of molestation, noting that Bruno first molested D.A. sometime between 2006 and 2007 and then again, years later, engaged in repeated acts of molestation. In its sentencing statement, the trial court found that the acts occurred over a long period of time and were "not a single mistake." *Transcript Volume II* at 96. As our Supreme Court has held, "additional criminal activity directed to the same victim should not be free of consequences." *Horton v. State*, 949 N.E.2d 346, 348 (Ind. 2011). The trial court's order of consecutive sentences demonstrates the trial court's acknowledgment of the two distinct time periods during which the molestations occurred. The trial court's rationale is apparent from the record and its imposition of consecutive sentences was not an abuse of discretion.

### 5. Inappropriate Sentence

Bruno argues that his sentence is inappropriate. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015). Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial

court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). The defendant bears the burden on appeal of persuading us that his sentence is inappropriate. *See id.*

[47] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell*, 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp*, 9 N.E.3d at 1292. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[48] In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offense. Bruno was convicted of two Class A felonies and two Class C felonies. The relevant statutes provide a sentencing range of twenty to fifty years with an advisory sentence of thirty years for a Class A felony and two to eight years with an advisory sentence of four years for a Class C felony. Ind. Code §§ 35-50-2-4, -6. Here, the trial court imposed enhanced sentences for each conviction and ordered the convictions for the Class A felonies to run consecutively as an acknowledgement that the crimes were committed during two separate and

distinct time periods against the same victim. Bruno's total aggregate sentence is eighty years.

[49] We begin with the nature of the offense. Bruno's offenses are particularly reprehensible. Bruno held himself out to be a man of God and used his position to ingratiate himself into D.A.'s family. D.A.'s parents trusted Bruno, providing him with a place to live, financially supporting the start-up of his church, and allowing him to care for their children, including D.A. D.A.'s father described Bruno as being like family. Bruno violated his extraordinary position of trust when he began molesting D.A. at just six years old. After D.A. courageously reported the abuse to his father, Bruno lied and covered up his actions by convincing D.A.'s father that D.A. was demonically possessed. A few years later, Bruno, who remained close with D.A.'s family, resumed his molestations of D.A. Over the course of the next several years, Bruno repeatedly molested D.A. by anal penetration and fondling. D.A. again summoned the courage to tell his father about Bruno's actions. When confronted again, Bruno initially denied having engaged in the alleged conduct. Although Bruno finally admitted to touching D.A., he continually denied that any anal penetration occurred.

[50] Bruno incorrectly argues that there was no proof of physical harm to D.A. There is evidence that D.A. suffered from encopresis and that, at one point, D.A. had a dilated anus. As noted above, D.A. told a nurse examiner about the sexual abuse and reported that "[i]t was really hurting my bottom and I am having problems when I have loose poop, it will leak some." *State's Sentencing*

*Exhibit 1*. Despite Bruno's desire to downplay this evidence, it is sufficient to establish that there was physical harm. We further note that the psychological harm of a spiritual leader and close family friend molesting a child over a period of years goes above and beyond the physical ramifications.

[51] Finally, we observe that the molestations occurred during two distinct time periods, the first occurring when D.A. was six years old. Years later, Bruno resumed his molestation of D.A. As noted above, the imposition of consecutive sentences accounts for the fact that Bruno molested a six-year-old D.A., had time (i.e., years) to reflect upon his actions, and yet began molesting D.A. again. Bruno has failed to show that the nature of his offense is deserving of a lesser sentence.

[52] With regard to the character of the offender, we note that Bruno is an undocumented immigrant. Aside from his repeated molestation of D.A. over a period of time, there is no evidence that he engaged in other criminal activity. More telling of his character, however, is that Bruno used his position of power as a spiritual leader to gain favor with D.A. and his family. He then abused their trust by molesting D.A. After D.A.'s first disclosure of the molestation, Bruno damaged the trust between D.A. and his father when Bruno convinced D.A.'s father that D.A.'s allegations were a result of being demonically possessed. In the end, Bruno did not voluntarily disclose his actions, but admitted to fondling D.A. only after confronted. Even then, he continued to downplay his actions while begging for forgiveness.

Bruno has failed to demonstrate that his aggregate eighty-year sentence is inappropriate in light of the nature of the offense or his character.

## 5. Restitution

Bruno argues that the trial court erred in ordering him to pay $5000 in restitution to the State. The restitution order covered the State's expenses for translation and transcription of the recorded conversation between D.A.'s father and Bruno that was taken from D.A.'s father's cell phone.

As part of a sentence or as a condition of probation, a trial court may order a defendant to pay restitution to a victim. *Bailey v. State*, 717 N.E.2d 1, 4 (Ind. 1999). We review a trial court's order of restitution for an abuse of discretion. *Rich v. State*, 890 N.E.2d 44, 49 (Ind. Ct. App. 2008), *trans. denied*.

Ind. Code § 35-50-5-3 sets forth the requirements for a restitution order, in pertinent part as follows:

> (a) Except as provided in subsection (i), (j), (l), or (m), in addition to any sentence imposed under this article for a felony or misdemeanor, the court may, as a condition of probation or without placing the person on probation, order the person to make restitution to the victim of the crime, the victim's estate, or the family of a victim who is deceased. The court shall base its restitution order upon a consideration of:
>
>> (1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);

(2) medical and hospital costs incurred by the victim (before the date of sentencing) as a result of the crime;

(3) the cost of medical laboratory tests to determine if the crime has caused the victim to contract a disease or other medical condition;

(4) earnings lost by the victim (before the date of sentencing) as a result of the crime including earnings lost while the victim was hospitalized or participating in the investigation or trial of the crime; and

(5) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime.

[57] The trial court abused its discretion in ordering Bruno to pay restitution. "[T]he principal purpose of restitution is to vindicate the rights of society and to impress upon the defendant the magnitude of the loss the crime has caused, and that restitution also serves to compensate the *victim*." *Iltzsch v. State*, 981 N.E.2d 55, 56 (Ind. 2013) (emphasis supplied). I.C. § 35-50-5-3(a) authorizes restitution only to the victim of the crime, the victim's estate, or the family of a victim who is deceased. While a State entity may be considered a victim for purposes of the restitution statute, the State must first make a showing as to how its entity was a victim. *Lohmiller v. State*, 884 N.E.2d 903, 916 (Ind. Ct. App. 2008). Where the State makes no such showing, the State is not a victim entitled to restitution. *Id*. (citing *Green v. State*, 811 N.E.2d 874, 879 (Ind. Ct. App. 2004)).

[58] Here the State merely requested restitution and submitted invoices for the translation and transcription services provided. The State did not show how it was a victim. The State is therefore not a victim entitled to restitution.

[59] Further, we note that I.C. § 35-50-5-3 provides for restitution for property damage, medical costs, cost of laboratory tests, lost earnings, and funeral and burial expenses. Here, the State is seeking reimbursement for costs associated with its investigation. As was noted by this court in *Green*, if the State were entitled to restitution any time it elects to spend money to obtain criminal evidence, then the State would seek restitution for any and all of its discovery costs. This is contrary to I.C. § 35-50-5-3 and the purposes of restitution. The trial court's restitution order is improper as a matter of law. We therefore reverse the trial court's order that Bruno pay $5000 in restitution to the State.

[60] Judgment affirmed in part and reversed in part.

Riley, J. and Crone, J., concur.